**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

DEBRA L. SYLVESTER,

    Plaintiff,

        v.

DGMB CASINO, LLC d/b/a RESORTS
CASINO HOTEL, et al.,

    Defendants.

Civil No. 15-8328 (RMB/KMW)

**OPINION**

APPEARANCES:

Zachary R. Wall, Esq.
Wall & London LLC
34 Tanner Street, Suite 4
Haddonfield, NJ 08033
    *Attorney for Plaintiff Debra L. Sylvester*

Russell L. Lichtenstein, Esq.
Stephanie E. Farrell, Esq.
Cooper Levenson, PA
1125 Atlantic Avenue, 3rd Floor
Atlantic City, NJ 08401
    *Attorneys for Defendant DGMB Casino, LLC
    d/b/a Resorts Casino Hotel*

**BUMB**, UNITED STATES DISTRICT JUDGE:


    This matter comes before the Court upon the Motion for

Summary Judgment [Docket No. 16] by Defendant DGMB Casino, LLC

d/b/a Resorts Casino Hotel (the "Defendant" or "Resorts"),

seeking the dismissal of the above-captioned matter brought by

Plaintiff Debra L. Sylvester (the "Plaintiff") in its entirety.

Having considered the parties' submissions and for the reasons set forth below, the Court grants, in part, and denies, in part, Defendant's motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was hired as a dual rate dealer by Resorts Casino Hotel, owned at the time by Defendant's predecessor entity, on or about September 26, 2005. Pl. Dep. Tr. 25:18-26:1, Def. MSJ Ex. A [Docket No. 16-3]. In 2010, once ownership of the Resorts Casino Hotel was transferred to Defendant, all employees of Resorts Casino Hotel, including Plaintiff, were required to reapply for their positions. Plaintiff was rehired by Defendant in late 2010. Id. 27:12-28:22. As a dual rate dealer, Plaintiff worked some shifts as a dealer and others as a supervisor. Id. 26:5-22. Plaintiff received satisfactory work performance evaluations throughout her employment and was never disciplined. Def. MSJ Ex. H [Docket No. 16-3]; Pl. Dep. Tr. 118:16-20. On occasion, Plaintiff received commendations based upon positive customer feedback. Pl. Opp. Exs. 4-7 [Docket No. 18-5].

In late August 2015, Plaintiff sought medical treatment for back pain at Atlantic County Family Spine and Rehabilitation Center. Pl. Dep. Tr. 71:1-20; Pl. Opp. Ex. 8 [Docket No. 18-5]. Plaintiff's medical and chiropractic records note back pain, lumbar spondylosis, and facet osteoarthritis. Pl. Opp. Ex. 8.

Thereafter, on September 12, 2015, Plaintiff requested and obtained FMLA leave paperwork from Defendant's human resources office. Plaintiff testified that she went to the human resources office, told the human resources representative her name and department and asked for the paperwork for FMLA leave. Pl. Dep. Tr. 57:6-58:13. Plaintiff did not have to fill out any forms to obtain the FMLA leave paperwork; she "just went and asked for it." Id. 69:10-14. Plaintiff does not know the name or position of the person she spoke with and cannot describe the person. Id. 58:3-19. She did not provide the individual with a doctor's note or indicate why she needed the FMLA paperwork. Id. 58:20-25. Indeed, Plaintiff does not know whether anyone at Resorts was aware that she had a disability. Id. 59:1-3.

There is no evidence that the individual in human resources who gave Plaintiff the blank FMLA leave paperwork recorded Plaintiff's name or request. See id. 69:16-18. Importantly, Barbara Hulsizer, Defendant's Executive Director of Workforce Development, explained that, pursuant to Defendant's policies, an employee may request an FMLA application packet from the human resources office, but that the office does not ask for or record the employee's name or job title. Hulsizer Dep. Tr. 86:1-24, Def. MSJ Ex. E [Docket No. 16-3].

Plaintiff then took the FMLA leave application paperwork to her chiropractor to complete. She believes she gave the

paperwork to her chiropractor before September 22, 2015, but cannot recall the exact date. Pl. Dep. Tr. 125:25-127:1. On September 23, 2015, Plaintiff's healthcare provider completed the FMLA leave application form, indicating that Plaintiff required chiropractic treatment twice a week for cervical and lumbar spine pain and that Plaintiff would be unable to work during pain flare-ups that may occur one to two times per month for a day or two at a time. Pl. Opp. Ex. 9 [Docket No. 18-5]. Plaintiff never submitted the completed FMLA leave paperwork to Defendant. Pl. Dep. Tr. 69:19-70:2; 109:19-24. Moreover, and significantly, Plaintiff admits that she did not tell anyone at Resorts about her request for FMLA leave. Id. 138:23-139:3.

On or about September 18, 2015, Resorts announced a new customer service initiative called "GET it!" and a training session in connection with the initiative. Def. MSJ Ex. C [Docket No. 16-3]. Plaintiff became aware of the training session via a memo that was placed in the gaming pit where she worked. Pl. Dep. Tr. 41:3-24; Def. MSJ Ex. C. The memo advised employees that the training session would be facilitated by the human resources team and would last approximately three hours. Def. MSJ Ex. C. It also advised employees to be "prepared to do the hula, impersonate Elvis, dance to YMCA, and many, many more exciting things!" Id. Plaintiff was required to attend the

training session on September 22, 2015.  Pl. Dep. Tr. 40:11-23;
69:1-3.

The training session on September 22, 2015 involved several
team building and icebreaker activities, as well as
presentations regarding customer service.  These included
activities involving nametags, a beach ball, a hula hoop, and
blindfolds.  The nametag activity, for example, required the
attendees to write the name of their first pet and the street on
which they lived on a nametag, instead of their real name.
Pl. Dep. Tr. 49:2-4.  The beach ball activity involved passing
around a beach ball and, depending on the color that the
participant's thumb landed on, each participant had to answer a
question or do a task.  Id. 49:4-8.  Another activity involved
two teams leading blindfolded participants through an obstacle
course set up with small cones.  Id. 52:2-13.  This activity
only required a small number of attendees to participate.
Plaintiff was not amongst the participants.  Id. 52:18-53:2.
Finally, the hula hoop activity involved several people
balancing a hula hoop on their fingers and getting it down to
the ground.  Id. 53:13-19.

According to Plaintiff, she participated fully in both the
nametag and beach ball activities.  Id. 49:16-50:17.  Plaintiff
testified that she wrote the words "Rex" and "Center Street,"
the names of her pet and street, respectively, on her nametag as

part of the nametag activity. Id. 133:3-17. As part of the beach ball activity, Plaintiff was asked her favorite quote, to which she honestly responded that she does not have one. Id. 50:2-17. Plaintiff testified that she participated in the hula hoop activity to the best of her ability, but that she was prevented from fully participating due to back pain. Id. 53:13-22; 54:5-12; 116:15-24; 136:25-137:8. Notably, Plaintiff did not inform anyone that she was unable to participate in the training because of pain or disability. Id. 55:2-8; 97:5-23. According to Plaintiff, she was cooperative throughout the training and did not make any negative comments. Id. 134:1-13.

Ms. Hulsizer, however, had a different impression of Plaintiff's participation during the training session. She observed Plaintiff to be "inflexible, uncooperative, [and] unwilling to participate." Hulsizer Dep. Tr. 72:10-15. According to Ms. Hulsizer, who also attended the training session, Plaintiff did not wear a nametag during the nametag activity and was uncooperative during the beach ball activity. During the beach ball activity, Ms. Hulsizer saw Plaintiff scowling and telling her coworker that she did not want to participate in the activity. Id. 74:4-14. Ms. Hulsizer testified that Plaintiff did not want to answer questions as part of the activity and described the process as "like pulling teeth." Id. 74:15-75:1. As to the hula hoop activity,

Ms. Hulsizer heard Plaintiff state that she did not want to participate in the activity, but noted that she eventually did. Id. 75:1-9. Overall, in Ms. Hulsizer's view, Plaintiff's demeanor and conduct during the activity was rude and uncooperative. Id.

Approximately fifteen minutes before the training session ended, Plaintiff and another employee stood up to leave. Pl. Dep. Tr. 55:18-21. Plaintiff stated that she needed to leave because her shift was beginning shortly and she did not want to be late. Id. 95:15-17; 134:19-135:10. Ms. Hulsizer told Plaintiff to retake her seat as the training had not yet concluded. Hulsizer Dep. Tr. 75:10-22; see also Pl. Dep. Tr. 55:25-56:3; 135:11-13. At her deposition, Plaintiff testified that she later told Kevin Brady, the Resorts Vice President of Casino Operations, that she stood up because she was in pain. Id. 94:23-95:3. In the remaining minutes of the session, Ms. Hulsizer directly addressed Plaintiff by name to "engage her," but Plaintiff did not respond. Hulsizer Dep. Tr. 75:21-25. After the training session had concluded, Ms. Hulsizer was "so furious with [Plaintiff's] behavior," which she found to be "so disrespectful." Id. 75:23-76:5. She described being "incensed by [Plaintiff's] conduct." Id.

Thereafter, Ms. Hulsizer met with Mr. Brady and Daniel Fanty, the Resorts Casino Manager, to discuss Plaintiff's

behavior during the training session. Id. 76:4-22; Fanty Dep. Tr. 54:9-55:4, Def. MSJ Ex. E [Docket No. 16-3]. During that meeting, Ms. Hulsizer described Plaintiff's behavior as the "total antithesis to everything that our department stands for." Fanty Dep. Tr. 54:22-55:4. Mr. Brady stated that, according to Ms. Hulsizer, Plaintiff did not participate in the training session and had "numerous pejorative type of encounters in there with the training personnel." Brady Dep. Tr. 15:24-16:16. He had also been informed that Plaintiff refused to answer questions during the training session, attempted to leave the session before it was over, and refused to participate in the beach ball activity. Id. 16:24-17:13. He testified that Plaintiff's reported conduct and demeanor "was probably the worst behavior [he has] ever encountered . . . by an employee with respect to people participating in a training in a customer service class." Id. 17:14-19. He further described Plaintiff's behavior as "deplorable" and "unbecoming" of a Resorts employee. Id. 21:22-25. Mr. Brady told Ms. Hulsizer that he "won't have somebody like that work for [him]." Hulsizer Dep. Tr. 78:18-22. Mr. Fanty likewise noted that Plaintiff's reported conduct was insubordinate and reflect an unwillingness to participate in the training session. Fanty Dep. Tr. 51:24-52:10. Ms. Hulsizer further informed Mr. Fanty that Plaintiff's "lack of participation was horrible as a manager" and that "her lack of

participation was [such that] if she wasn't there she couldn't have participated less." Id. 68:3-11. Ms. Hulsizer stated that "she had never seen anything like that before." Id. 68:19-22.

At that meeting, the decision was made that Plaintiff's employment should be terminated as a result of the reports about her conduct during the September 22, 2015 training session. Brady Dep. Tr. 15:24-16:16; 44:16-45:3. This decision was the result of a collaborative effort. Id. 15:4-14; Fanty Dep. Tr. 51:13-17. Mr. Brady explained, however, that the decision was not yet final and that Plaintiff was to be given an opportunity to present a plausible explanation for her behavior. Brady Dep. Tr. 21:16-22:18.

On September 24, 2015, Plaintiff received a call from her direct supervisor, Frank Jakimowicz, informing her that she needed to come to work the following day to meet with Mr. Brady and Mr. Fanty. Pl. Dep. Tr. 60:1-21. Plaintiff told Mr. Jakimowicz that she had a chiropractor's appointment that morning and he informed her that would not be a problem as the meeting was scheduled for 12:00 p.m. Id. 66:4-20. Plaintiff did not tell Mr. Jakimowicz that she was suffering from a disability or why she had an appointment with a chiropractor. Id. 66:21-67:1.

On September 25, 2015, Plaintiff met with Mr. Fanty and Mr. Brady. Id. 59:5-25. Although Plaintiff's termination

notice had already been prepared, Mr. Brady retained the ability
to reconsider the decision to discharge Plaintiff in the event
that she presented a reasonable explanation or justification for
her behavior at the training session.  Brady Dep. Tr. 22:19-
23:6.  Mr. Brady informed Plaintiff that he had spoken with
someone regarding Plaintiff's conduct and demeanor at the
customer service training session and that he was not happy with
what he heard.  Pl. Dep. Tr. 61:5-62:11.

     According to Plaintiff's version, she informed Mr. Fanty
and Mr. Brady that she "had been under chiropractor's care" and
that she "had a female situation," namely menstrual cramps, at
the time of the training session, to which they responded that
she "had two choices; to resign or be terminated."  Id. 62:13-
18; 96:21-97:3.  Mr. Brady testified, however, that Plaintiff
did not tell him that she had back pain or menstrual cramps
during the training session or that she was under the care of a
chiropractor.  Brady Dep. Tr. 24:7-25:13.  Indeed, he stated
that she did not say anything during the meeting that justified
her conduct.  Id. 21:3-11.  Similarly, Mr. Fanty does not recall
Plaintiff stating that she had back pain or menstrual cramps
during the training session or that she was under the care of a
chiropractor.  Fanty Dep. Tr. 56:16-57:13.  Mr. Brady further
testified that Resorts would have reconsidered its decision to
terminate Plaintiff's employment if she had presented a "bona

fide reason" or justification for her uncooperative conduct at the training session. Brady Dep. Tr. 22:19-22; 25:16-26:21. Mr. Brady was not aware that Plaintiff had requested an FMLA leave application or that she had any intention of taking FMLA leave. Id. 26:22-27:8.

During the meeting, the termination notice prepared by Defendant was facedown on the desk. After Plaintiff stated that she would not resign, Mr. Fanty turned the notice over, signed it, and handed it to Plaintiff. Pl. Dep. Tr. 63:2-17. The paper, which had been typed in advance, indicated that Defendant was terminating Plaintiff's employment due to her "uncooperative and unprofessional conduct" at the customer service training session. Id. 63:19-64:6; 67:11-21; 93:23-94:18; Def. MSJ Ex. F [Docket No. 16-3]. Plaintiff refused to sign the termination notice because she did not believe that she deserved to be fired. Pl. Dep. Tr. 93:5-22; see also Def. MSJ Ex. F; Fanty Dep. Tr. 56:3-6. Notably, Plaintiff testified that she has no evidence or facts that suggest that this reason was not the real reason for her termination. Pl. Dep. Tr. 64:16-65:2.

Based upon these facts, Plaintiff claims that Defendant wrongfully terminated her employment for unlawful discriminatory reasons. On November 30, 2015, Plaintiff commenced the instant litigation, setting forth the following counts: discriminatory termination on the basis of disability in violation of the New

Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, et seq. ("NJLAD") (Count One); failure to provide reasonable accommodations in violation of NJLAD (Count Two); interference and wrongful discharge in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA") (Count Three); and gender discrimination in violation of NJLAD (Count Four) [Docket No. 1]. Thereafter, on January 16, 2017, Defendant moved for summary judgment in its favor on all counts [Docket No. 16]. On February 24, 2017, upon consent of the parties, Count Two and Count Three of the Complaint, Plaintiff's reasonable accommodation and gender discrimination claims, respectively, were dismissed with prejudice [Docket No. 24].

## II. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id.

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should

be resolved against the moving party." <u>Meyer v. Riegel Prods.</u>
<u>Corps.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere
"scintilla of evidence," without more, will not give rise to a
genuine dispute for trial.  <u>Anderson</u>, 477 U.S. at 252.
Moreover, a court need not adopt the version of facts asserted
by the nonmoving party if those facts are "utterly discredited
by the record [so] that no reasonable jury" could believe them.
<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  In the face of such
evidence, summary judgment is still appropriate "where the
record . . . could not lead a rational trier of fact to find for
the nonmoving party[.]"  <u>Matsushita Elec. Indus. Co. v. Zenith</u>
<u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).

    The movant "always bears the initial responsibility of
informing the district court of the basis for its motion, and
identifying those portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together
with the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact."  <u>Celotex Corp. v.</u>
<u>Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ.
P. 56(c)).  Then, "when a properly supported motion for summary
judgment [has been] made, the adverse party 'must set forth
specific facts showing that there is a genuine issue for
trial.'"  <u>Anderson</u>, 477 U.S. at 250 (citing Fed. R. Civ.
P. 56(e)).  In the face of a properly supported motion for

summary judgment, the nonmovant's burden is rigorous: she "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")).

## III. ANALYSIS

### A. NJLAD Discriminatory Discharge

The NJLAD prohibits employment discrimination on the basis of disability or perceived disability. Discriminatory discharge claims under the NJLAD are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Joseph v. New Jersey Transit Rail Operations Inc., 586 F. App'x 890, 892 (3d Cir. 2014) (citing Viscik v. Fowler Equip. Co., 173 N.J. 1, 13-14 (2002)); Battaglia v. United Parcel Servs., Inc., 214 N.J. 518, 546 (2013) ("All LAD claims are evaluated in accordance with the United States Supreme Court's burden-shifting mechanism.").

Under this burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 848 (3d Cir. 2016) (citing Victor v. State, 203 N.J. 383, 408-09 (2010)).

After a plaintiff demonstrates her prima facie case of discriminatory discharge, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Id. at 842. "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Terry v. Borough, 660 F. App'x 160, 163 (3d Cir. 2016) (quoting Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)).

### i. **Prima Facie Case**

To establish a prima facie case of discriminatory discharge due to a disability, in violation of the NJLAD, a plaintiff must establish: "(1) that [she] is a member of a protected class [i.e. that [she] was disabled or perceived to be disabled]; (2) that [she] was otherwise qualified and performing the essential functions of the job; (3) that [she] was terminated; and (4) that the employer thereafter sought similarly qualified individuals for the job who were not members of [her] protected class." Joseph, 586 F. App'x at 892 (citing Victor, 203 N.J. at 409).

There is no dispute that Plaintiff satisfies the third element of the prima facie case, as Defendant terminated Plaintiff's employment on September 25, 2015. Def. MSJ Ex. F.

Defendant, however, contends that Plaintiff cannot establish the remaining elements of the prima facie case.

First, Defendant argues that Plaintiff cannot establish that she is disabled because back pain does not rise to the level of a disability under the NJLAD and because Plaintiff's purported disability is not supported by medical evidence. Under the NJLAD, a disability is defined as any "physical disability, infirmity, malformation or disfigurement which is caused by bodily injury . . . which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." N.J.S.A. § 10:5-5(q).[1] The NJLAD's definition of disability is very broad and does not require that a disability restrict any major life activities to any degree. Enriquez v. W. Jersey Health Sys., 342 N.J. Super. 501, 519 (App. Div. 2001); see also Viscik, 173 N.J. at 16 ("The term 'handicapped' in LAD is not restricted to 'severe' or 'immutable' disabilities and has been interpreted as significantly broader than the analogous provisions of the

_____

[1] An amendment to the NJLAD "replaced statutory references to a 'handicap' with the term 'disability.'" Russo v. Chico's FAS, Inc., 2011 WL 4901357, at *6 n.5 (D.N.J. Oct. 14, 2011) (citing 2003 N.J. Sess. Law Serv. Ch. 180 (Assembly 3774) (West))); State v. Dixon, 396 N.J. Super. 329, 339 (App. Div. 2007) (noting that NJLAD was amended "to delete the term 'handicap' and substitute 'disability'" but that the "current definition of the term remains essentially the same.").

Americans with Disabilities Act."); <u>Failla v. City of Passaic</u>,
146 F.3d 149, 153-54 (3d Cir. 1998) (jury's conclusion that
plaintiff, who suffered from a back injury, was not disabled as
defined by the ADA was not inconsistent with its finding that he
had a "handicap" under the NJLAD).

Here, Plaintiff has produced her medical records from the
Atlantic County Family Spine and Rehabilitation Center, which
establish that, prior to the training session and her discharge,
she had been treated for back pain caused by back disorders
including spondylosis and osteoarthritis.  Pl. Opp. Ex. 8.  This
is sufficient evidence to establish that Plaintiff was disabled
under the NJLAD.

Defendant next argues that Plaintiff cannot establish that
she was otherwise qualified and performing the essential
functions of the job in light of her alleged unprofessional and
uncooperative behavior during the training session.  As a
preliminary matter, the Court notes that the icebreaker and team
building games during the training session are not essential
functions of Plaintiff's job.  Moreover, there is no evidence in
the record, however, that indicates that Plaintiff was not
performing the essential functions of her job as a dual rate
dealer.  Indeed, the record establishes that Plaintiff received
satisfactory work performance evaluations and, on a handful of
occasions, received commendations for her work performance based

upon positive customer feedback.  There are, however, material disputes of fact as to Plaintiff's behavior during the training session.  While Defendant claims that Plaintiff was insubordinate and unprofessional during the session, Plaintiff denies such allegations and contends that she participated willingly and to the best of her ability.  Although it is a "he said she said" dispute, the record before the Court, presents at least a genuine issue of material fact as to whether Plaintiff was qualified and performing the essential functions of her job at the time of her termination.

Finally, Defendant argues that Plaintiff cannot establish the final element of the prima facie case because there is no evidence in the record that Defendant sought similarly qualified individuals who are not disabled to replace her.  The fourth element of the prima facie case, however, is not as strict as Defendant contends.  "The fourth element is needed to allow an inference to be drawn of disparate treatment, since if the disabled employee's job was given to a nondisabled person it could be inferred that the disabled employee received the adverse job action because of his or her disability."  Rosenfeld v. Canon Bus. Sols., Inc., 2011 WL 4527959, at *19 (D.N.J. Sept. 26, 2011) (quoting Seiden v. Marina Assocs., 315 N.J. Super. 451, 459 (Law. Div. 1998)).  A plaintiff need not "establish unfailingly as part of the prima facie case that plaintiff was

replaced by an individual outside the plaintiff's protected class." Williams v. Pemberton Twp. Pub. Sch., 323 N.J. Super. 490, 502 (App. Div. 1999).  Rather, New Jersey courts have held that "[b]ecause of the variety of adverse employment actions that may occur short of termination . . . [t]he appropriate fourth element of a plaintiff's prima facie case requires a showing that the challenged employment decision . . . took place under circumstances that give rise to an inference of unlawful discrimination."  Id. (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996); Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995)); accord Gadbois v. State, 2009 WL 1310973, at *5 (N.J. Super. Ct. App. Div. May 13, 2009).  This "formulation permits a plaintiff to satisfy the fourth element in a variety of ways."  Williams, 323 N.J. Super. at 502.

As Plaintiff concedes, there is no evidence in the record that supports a finding that Defendant knew--prior to the September 25, 2015 meeting-- that Plaintiff suffered from a disability in general or that she was experiencing back pain as a result of said disability during the training session.  See, e.g., Pl. Dep. Tr. 55:2-8; 58:20-25; 59:1-3; 66:21-67:1; 97:5-23.  Thus, as Defendant was unaware of Plaintiff's back pain or disability prior to meeting with Plaintiff on September 25,

2015, Plaintiff cannot make a showing that Defendant's preliminary decision to terminate her employment due to Ms. Hulsizer's reports of Plaintiff's conduct at the training session took place under circumstances that suggest unlawful discrimination. See Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 331 (3d Cir. 2003) (noting in ADA-context that, while an employer may be liable for discriminating against an employee "based upon the employee's known disability, neither the law nor common sense can demand clairvoyance of an employer in [defendant's] position.") (emphasis in original).

The undisputed evidence, however, establishes that the decision to terminate Plaintiff's employment was not final prior to the September 25, 2015 meeting with Plaintiff. Indeed, Mr. Brady testified that had Plaintiff presented a legitimate explanation or justification for her alleged behavior at the training session, such as back pain, he would have reconsidered the decision to discharge Plaintiff. Brady Dep. Tr. 21:16-23:6; 25:16-26:21.

Herein lie the genuine disputes of material fact. Plaintiff disputes Defendant's accounts of both her conduct at the training session and the September 25, 2015 meeting. According to Plaintiff, she was cooperative during the training session and participated willingly and to the best of her ability in the activities. Pl. Dep. Tr. 53:13-22; 54:5-12;

116:15-24; 134:1-13; 136:25-137:8. More to the point, Plaintiff claims that she informed Mr. Brady and Mr. Fanty at the September 25, 2015 meeting that she suffered from a disability for which she was under the care of a chiropractor and that any perceived lack of participation during the training session was due to back pain caused by her disability. Id. 62:13-18; 94:23-97:3.

Plaintiff's burden of establishing a prima facie case of disability discrimination under the NJLAD is "'rather modest' at most and should not be onerous." Swiatek v. Bemis Co., 542 F. App'x 183, 186 (3d Cir. 2013) (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005)); see also Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981)); Stouch v. Twp. Of Irvington, 354 F. App'x 660, 667 n.4 (3d Cir. 2009) (noting that "[a] plaintiff's burden to establish a prima facie case of discrimination under the NJLAD is less onerous than under the ADA") (citing Failla, 146 F.3d at 154). If a jury believes Plaintiff's account of the training session and the September 25, 2015 meeting, the jury could properly conclude that Defendant fired Plaintiff because she did not participate in team building games that Defendant knew she could

not fully participate in due to her disability.[2]  Resolving all

reasonable inferences in favor of Plaintiff as the non-moving

party, the Court finds that Plaintiff has raised a slim but

genuine dispute of material fact as to the final element of the

prima facie case, precluding summary judgment at this stage of

the burden-shifting analysis.[3]

### ii.  **Legitimate Nondiscriminatory Reason**

Assuming that Plaintiff can establish a prima facie case of

discriminatory discharge on the basis of disability, under the

McDonnell Douglas framework, the burden then shifts to Defendant

to articulate a legitimate nondiscriminatory reason for

terminating Plaintiff's employment.  Tourtellotte, 636 F. App'x

at 842; see also McDonnell Douglas, 411 U.S. at 802.

---

[2] The Court notes, however, that a jury may instead choose
to believe Ms. Hulsizer's account of Plaintiff's behavior at the
training session, namely that Plaintiff not only did not
participate in the activities, but that Plaintiff was rude,
insubordinate, and unprofessional.  Even if the jury were to
find that Plaintiff's back pain and disability justified her
lack of participation, it does not follow that any rudeness or
unprofessionalism is also justified.  In that case, the jury may
very well determine that Plaintiff cannot make a showing that
her termination took place under circumstances that give rise to
an inference of unlawful discrimination and, therefore, that she
has not established her prima facie case.

[3] The Court takes this opportunity to note that a party
cannot simply deny summary judgment by presenting false
testimony.  If it turns out that the jury finds that such
testimony was false, the Court can always address the issue with
measures such as an award of attorney's fees.

Defendant contends that it terminated Plaintiff's employment on September 25, 2015 because of what it viewed as her insubordinate and unprofessional conduct and demeanor during the September 22, 2015 training session.  Mr. Brady testified that Plaintiff's conduct at the training session, as reported to him by Ms. Hulsizer, was "deplorable" and the "worst" conduct of which he was aware.  Brady Dep. Tr. 17:14-19; 21:22-25.  Mr. Fanty echoed these sentiments, testifying that Plaintiff's observed demeanor was the "total antithesis" to her position and the values of the company.  Fanty Dep. Tr. 54:22-55:4.  As a result of the insubordination and unprofessionalism by Plaintiff during the training session, reported by Ms. Hulsizer, Defendant terminated Plaintiff's employment immediately.  According to Defendant, Plaintiff's disability was not even a factor in her termination as Defendant claims it was unaware that she suffered from any disability.

The Court finds that Defendant has met its "minimal burden" of articulating a legitimate nondiscriminatory reason for its decision to terminate Plaintiff's employment.  <u>See</u> <u>Lichtenstein v. Univ. of Pittsburgh Med. Ctr.</u>, 691 F.3d 294, 302 (3d Cir. 2012).

### iii. **Pretext**

As Defendant has articulated a legitimate, nondiscriminatory reason for its decision to terminate

Plaintiff's employment, the burden shifts back to Plaintiff to establish that the proffered reason is merely pretext for unlawful disability discrimination.  <u>Tourtellotte</u>, 636 F. App'x at 842.

A plaintiff may establish pretext and, therefore, survive summary judgment, by discrediting the defendant's proffered reasons or producing evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  <u>Id.</u>  To do so, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Id.</u> (citing <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006)); <u>accord</u> <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994).

Importantly, "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  <u>Fuentes</u>, 32 F.3d at 765.  Instead, the plaintiff "must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

24

employer's proffered legitimate reasons for its action that a
reasonable factfinder could rationally find them unworthy of
credence, and hence infer that the employer did not act for [the
asserted] nondiscriminatory reasons.'" Tourtellotte, 636
F. App'x at 842 (quoting Tomasso, 445 F.3d at 706 (quoting
Fuentes, 32 F.3d at 765)).

Defendant argues that Plaintiff cannot establish that its
legitimate non-discriminatory reason for terminating Plaintiff's
employment is pretext.  Mr. Brady, Mr. Fanty, and Ms. Hulsizer
each consistently testified that Plaintiff's termination was the
direct result of her purportedly unprofessional and
insubordinate conduct at the training session.  Indeed, even
Plaintiff does not genuinely dispute that the reason she was
called into the September 25, 2015 termination meeting was
because of Ms. Hulsizer's reports about her conduct at the
training session.

Plaintiff, however, disputes Ms. Hulsizer's account of her
conduct.  Additionally, Plaintiff claims that she informed
Mr. Brady and Mr. Fanty at the September 25, 2015 meeting that
she suffered from a disability for which she was under a
chiropractor's care and that she was experiencing pain as a
result of this disability during the training session which
limited her ability to fully participate in each of the
activities.  According to Plaintiff, Defendant nevertheless

pushed forward with its decision to fire her, even after learning that Plaintiff was unable to fully participate in each activity during the training session because of her disability and resultant pain.  Moreover, Mr. Brady testified that Defendant's policy is to permit an employee to present a legitimate justification or explanation for his or her otherwise problematic conduct prior to formally terminating the employee. He explained that he would reconsider a decision to terminate an employee if the employee presented a bona fide or plausible explanation for his or her behavior, such as a recent death in the family.  Brady Dep. Tr. 21:16-23:6; 25:16-26:21.  Yet when Plaintiff says she provided a legitimate explanation for any perceived uncooperativeness or lack of participation at the training session--back pain caused by her disability--Defendant did not reconsider its decision, as Mr. Brady said it would, and terminated Plaintiff's employment.

While the overwhelming evidence supports the conclusion that Defendant was neither aware of Plaintiff's disability nor her back pain during the training session until after Plaintiff was discharged, Plaintiff claims otherwise.  This Court may not weigh the evidence or make credibility determinations in resolving the instant motion for summary judgment.  If Plaintiff's account is believed, Defendant fired her not only learning that she was disabled, but, more to the point, because

of limitations in her ability to participate in certain
activities that were caused by her disability.  In light of
Plaintiff's testimony regarding her conduct at the training
session, as well as her testimony that she informed Defendant at
the September 25, 2015 meeting that she was in pain caused by
her disability during the training session, the Court finds that
Plaintiff has demonstrated inconsistencies with Defendant's
explanation for her termination.  In this Court's view,
Plaintiff's testimony regarding the training session and the
September 25, 2015 meeting, coupled with Mr. Brady's testimony
that he would have reconsidered the decision to terminate
Plaintiff if she had presented a plausible justification for her
behavior at the training session, is sufficient, although
barely, to establish pretext and survive summary judgment.

Defendant argues that even if Plaintiff is disabled and
informed Defendant of her disability, Defendant is nonetheless
entitled to terminate Plaintiff because her disability does not
excuse her unprofessionalism, rudeness, and insubordination.
The Court agrees--in theory.  The evidence in this case,
however, demonstrates that there are genuine disputes of
material fact as to Plaintiff's purported unprofessionalism.  If
the evidence presented at trial persuades the jury that
Plaintiff was in fact unprofessional, rude, and insubordinate,
as Defendant claims, then Defendant is correct that Plaintiff's

pain and disability are immaterial.  Even if Plaintiff's alleged

rudeness and unprofessionalism stemmed from her pain and

disability, her pain and disability do not give her license to

act disrespectfully or unprofessionally at work.[4]  If, on the

other hand, the jury is persuaded that Plaintiff did not make

any rude comments or facial expressions during the training

session, but was instead merely limited in her ability to

participate in physical activities due to her disability and

pain, then the jury could reasonably conclude that Defendant's

decision to terminate her employment because of this, even after

learning of her disability, is unlawful discrimination.

---

[4] Defendant relies upon the Third Circuit's decision in
Sever v. Henderson, 220 F. App'x 159 (3d Cir. 2007), for the
proposition that Defendant was free to terminate Plaintiff for
her misconduct even if that misconduct was related to her
disability.  The Court notes, however, that the facts involved
in Sever are markedly different from those presented in this
action.  The plaintiff in Sever claimed that he had been
discriminatorily discharged as a result of his mental illness.
The defendant, in turn, proffered that it had fired the
plaintiff because he had threatened to kill his coworkers and
had been convicted of a crime in connection with those threats.
220 F. App'x at 161.  Based upon these facts, the Third Circuit
held that, "even assuming that Sever suffers from a disability,
his employer may nevertheless hold him to certain 'qualification
standards,' including the requirement that an individual not
pose a direct threat to the health or safety of other
individuals in the workplace."  Id.  Thus, the Sever court
reasoned, "[t]hough an employer is prohibited from discharging
an employee based on his disability, the employer is not
prohibited from discharging an employee for misconduct, even if
that misconduct is related to his disability."  Id. at 161-62.
Here, as noted above, there are genuine issues of material fact
as to whether Plaintiff engaged in misconduct, and, if so, to
what degree, during the training session in the first place.

Accordingly, for the reasons set forth above, the Court finds that Plaintiff has presented minimal--but sufficient--evidence to establish pretext and, thus, has narrowly survived summary judgment on her NJLAD claim.

### iv.  **Punitive Damages**

Finally, Defendant seeks the dismissal of Plaintiff's request for punitive damages.  To recover punitive damages under the NJLAD, a plaintiff must establish: (1) "actual participation in or willful indifference to the wrongful conduct on the part of upper management" and (2) "proof that the offending conduct [is] 'especially egregious.'"  Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 113 (1999) (quoting Rendine v. Pantzer, 141 N.J. 292, 313 (1995)); accord Muzslay v. City of Ocean City, 238 F. App'x 785, 791 (3d Cir. 2007).

Defendant does not appear to dispute that members of Defendant's upper management actually participated in Plaintiff's termination.  Rather, Defendant argues that there is no evidence of any especially egregious conduct on the part of Resorts or any members of its upper management.  While the Court sees little to support a punitive damages award, the issue of punitive damages is generally a question of fact for the jury. Elmiry v. Wachovia Corp., 2007 WL 4117260, at *16 (D.N.J. Nov. 16, 2007) (quoting Fisher v. Volz, 496 F.2d 333, 347 (3d Cir. 1974)).  Therefore, summary judgment is denied without prejudice

as to Plaintiff's request for punitive damages.  Defendant may
revisit the issue at the appropriate time at trial, if it so
chooses.[5]

### B. <u>Family Medical Leave Act</u>

The FMLA, requires covered employers to provide
"12 workweeks of leave" for the following reasons: "(A) because
of the birth of a child of the employee and in order to care for
such child; (B) because of the placement of a child with the
employee for adoption or foster care; (C) in order to care for
the spouse, son, daughter, or parent of the employee, if such
relative has a serious health condition; and (D) because of a
serious health care condition that makes the employee unable to
perform the function of the position of such employee."
29 U.S.C. § 2612(a)(1).  The FMLA grants an employee a private
right of action against an employer for violations of the FMLA.
29 U.S.C. § 2617(a)(2)(A).  The focus of the Plaintiff's FMLA
claim is section D, termed the self-care provision, which
provides leave to employees because of a serious health care
condition.  29 U.S.C. § 2612(a)(1)(D).

The principal objectives of the FMLA are to "balance the
demands of the workplace with the needs of families" and "to
entitle employees to take reasonable leave for medical reasons."

---

[5] The Court is likely to bifurcate the punitive damages
phase of the trial.  As a result, this issue may become moot.

<u>Callison v. City of Philadelphia</u>, 430 F.3d 117, 119 (3d Cir. 2005) (quoting 29 U.S.C. § 2601(b)(1) and (2)). To serve those ends, "[t]he FMLA contains two relatively distinct types of provisions. First, it creates a series of prescriptive substantive rights for eligible employees, often referred to as the 'entitlement' or 'interference' provisions which set floors for employer conduct." <u>Id.</u> "Additionally, the FMLA provides protection against discrimination based on the exercise of these rights, often referred to as the 'discrimination' or 'retaliation' provisions." <u>Id.</u>

Count Three of Plaintiff's Complaint appears to assert both an FMLA interference claim and an FMLA retaliation claim. While Defendant moved for summary judgment on both theories, Plaintiff only defends her FMLA interference claim in her brief in opposition to summary judgment. <u>See</u> Pl. Opp. Br. at 18-21 [Docket No. 18]. Indeed, nowhere in her opposition brief does Plaintiff address her FMLA retaliation claim, let alone argue why it should not be dismissed. Thus, the Court finds that by failing to address the FMLA retaliation claim at all in her opposition brief, Plaintiff has abandoned the FMLA retaliation claim as set forth in her Complaint. <u>Fischer v. G4S Secure Sols. USA, Inc.</u>, 614 F. App'x 87, 91 n.3 (3d Cir. 2015) (affirming district court's determination that plaintiff abandoned claim by failing to address it at all in opposition to

motion for summary judgment and noting that "[i]t is a
well-settled rule that a party opposing a summary judgment
motion must inform the trial judge of the reasons, legal or
factual, why summary judgment should not be entered.  If it does
not do so, and loses the motion, it cannot raise such reasons on
appeal."); see also McKenna v. Portman, 538 F. App'x 221, 224
n.5 (3d Cir. 2013) ("Although their Amended Complaint seeks
relief under the First, Fourth, Fifth, Sixth, and Fourteenth
Amendments, in their briefs both before this Court and the
District Court, Plaintiffs only oppose the dismissal of their
Fifth and Fourteenth Amendment claims and essentially concede
all remaining claims.").  Accordingly, summary judgment shall be
granted on the FMLA retaliation claim in favor of the Defendant
and the claim shall be dismissed.

The Court next turns to Plaintiff's FMLA interference
claim.  Section 2615(a)(1) of the FMLA provides that "[i]t shall
be unlawful for an employer to interfere with, restrain, or deny
the exercise of or the attempt to exercise, any right provided
under this subchapter."  29 U.S.C. § 2615(a)(1).  To succeed on
an FMLA interference claim, Plaintiff must show that she "was
entitled to benefits under the FMLA and that [she] was denied
them."  Callison, 430 F.3d at 119.  "An interference claim is
not about discrimination, it is only about whether the employer
provided the employee with the entitlements guaranteed by the

FMLA." Id. at 120. As such, the familiar McDonnell Douglas burden-shifting analysis used in employment discrimination matters is not applicable. Sommer v. The Vanguard Grp., 461 F.3d 397, 399 (3d Cir. 2006).

To defeat summary judgment as to her FMLA interference claim, Plaintiff must establish that "(1) [she] was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of [her] intention to take FMLA leave; and (5) the plaintiff was denied benefits to which [she] was entitled under the FMLA." Capps v. Mondelez Glob., LLC, 847 F.3d 144, 155 (3d Cir. 2017) (quoting Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014)).

Defendant argues that summary judgment must be granted in its favor on Plaintiff's FMLA interference claim because Plaintiff never actually exercised her rights under the FMLA, as she never submitted a request for FMLA leave, and, therefore, Defendant did not have any notice of her intent to take FMLA leave. Plaintiff counters that her request for FMLA leave paperwork from the human resources office put Defendant on notice of her intent to take FMLA leave.

To invoke her rights under the FMLA, an employee must provide her employer with adequate notice of her need to take

leave.  29 U.S.C. § 2612(e)(2).  "In doing so, the employee

'need not expressly assert rights under the FMLA or even mention

the FMLA.'"  Lichtenstein, 691 F.3d at 303 (quoting 29 C.F.R.

§ 825.303(b)).  As the Third Circuit has explained:

> The regulations provide some guidance as to what sort
> of notice is sufficient.  It is clear that an employee
> need not give his employer a formal written request
> for anticipated leave.  Simple verbal notification is
> sufficient:
>
> "An employee shall provide at least verbal notice
> sufficient to make the employer aware that the
> employee needs FMLA-qualifying leave, and the
> anticipated timing and duration of the leave.  The
> employee need not expressly assert rights under the
> FMLA or even mention the FMLA . . . ."

Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d

Cir. 2007) (quoting 29 C.F.R. § 825.302(c)).  "The issue is

whether the employee has 'state[d] a qualifying reason for the

needed leave.'"  Id. (quoting 29 C.F.R. § 825.208(a)(2)).  It is

well-established that, "[i]n providing notice, the employee need

not use any magic words."  Id.  The Third Circuit has observed,

however, that "where courts have found notice to be deficient,

it has been because the employee failed to convey the reason for

needing leave."  Id. at 403 (collecting cases).

There is simply no evidence that Plaintiff provided

Defendant with adequate notice of her need for FMLA leave.  On

September 12, 2015, Plaintiff visited Defendant's human

resources office and requested FMLA leave paperwork.  Pl. Dep.

Tr. 57:25-58:16.  That is it.  Plaintiff cannot identify or
describe the person she spoke with in the human resources
office.  Id. 58:3-58:19.  Plaintiff advised the individual of
her name and department and asked for the paperwork for FMLA
leave.  Id. 58:7-13.  By Plaintiff's own admission, however, she
did not give the individual a doctor's note or indicate why she
needed the paperwork.  Id. 58:20-25.  There is no evidence in
the record that the individual recorded Plaintiff's name when
she asked for the FMLA leave paperwork.  Plaintiff does not know
whether the individual wrote her name down.  Id. 69:16-18.
Indeed, Ms. Hulsizer testified that it is not part of Resorts'
rules or policies to record the names of employees who request
FMLA leave paperwork.  Hulsizer Dep. Tr. 86:6-24.

On or about September 23, 2015, Plaintiff's chiropractor
completed the FMLA paperwork, indicating that Plaintiff needed
chiropractic treatment approximately two times per week and that
she would be unable to work during flare-ups of her back pain
one to two times per month.  Pl. Opp. Ex. 9.  Although Plaintiff
claims that she had the completed FMLA leave paperwork in tow
when she was terminated, Plaintiff concedes that she never
handed in the completed FMLA paperwork to Defendant.  Pl. Dep.
Tr. 69:19-70:2.  Additionally, Plaintiff admitted in her
deposition that, other than picking up the FMLA paperwork, she
had no other evidence to support her claim that the decision to

terminate her employment was made because she intended to take FMLA leave.  Id. 84:1-10.  Plaintiff also testified that she did not tell anyone else at Resorts about her intent to take FMLA leave.  Id. 139:1-3.  There is no evidence that Plaintiff ever informed Defendant that she suffered from any pain or disability that would require her to take leave.  Id. 57:3-5; 65:3-66:23. Moreover, she never requested any accommodations for her back pain or disability.  Id. 57:6-24; 118:9-15; 144:7-16.

In sum, the only evidence that Plaintiff proffers to support her FMLA interference claim is that she requested FMLA leave paperwork from an unidentified Resorts employee in the human resources office.  Critically, Plaintiff did not advise anyone, including the human resources employee, of why she requested the FMLA leave paperwork or that she intended to take FMLA leave due to her back pain.  Given the total absence of evidence in the record to support Plaintiff's claim that Defendant had notice of her intent to take FMLA leave, Plaintiff cannot establish that she invoked any FMLA rights or that she gave notice to Defendant of her intention to take FMLA leave, as required to survive summary judgment.  See Sarnowski, 510 F.3d at 403; Johnson v. Thru Point, Inc., 160 F. App'x 159, 162 (3d Cir. 2005); Treaster v. Conestoga Wood Specialties, Corp., 2010 WL 2606479, at *26 (M.D. Pa. Apr. 29, 2010).  Accordingly,

Plaintiff's FMLA interference claim fails and summary judgment on this claim is granted in favor of Defendant.

**IV.  CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted, in part, and denied, in part.  Summary judgment is denied as to Plaintiff's NJLAD disability discrimination claim (Count One).  Summary judgment is granted in Defendant's favor as to Plaintiff's FMLA claim (Count Three). An appropriate Order shall issue on this date.

s/Renée Marie Bumb<br>
RENÉE MARIE BUMB<br>
UNITED STATES DISTRICT JUDGE

Dated: <u>September 6, 2017</u>